IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| KEVIN MURPHY, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 0:21-cv-02336 |
| | § | |
| NATIONAL CREDIT SYSTEMS, INC., | § | |
| EQUIFAX INFORMATION SERVICES, | § | |
| LLC, and TRANSUNION, LLC, | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANT NATIONAL CREDIT SYSTEMS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

National Credit Systems, Inc. ("Defendant" or "NCS") files its Memorandum of Law in Support of Motion for Summary Judgment, pursuant to FED. R. CIV. P. 56 and shows as follows:

### SUMMARY OF ARGUMENT

This is a Fair Credit Reporting Act ("FCRA") and Fair Debt Collection Practices Act ("FDCPA") case. Defendant NCS is a debt collector who also furnishes account information to credit reporting agencies such as Defendants Experian, Trans Union, and Equifax. Murphy was a tenant at an apartment complex, where he terminated the lease early. The apartment landlord charged Murphy for utilities, trash removal, and administrative fees under the terms of the lease. Murphy sued the landlord for violation of the Fair Housing Act and Minnesota Human Rights Act for having charged him "pet rent" for his emotional support animal. Murphy and the landlord's settlement of that suit included a general release of claims. In the meantime, the landlord referred the debt for unpaid utilities, trash removal, and administrative fees under the apartment lease to NCS, who began reporting information on the debt to the credit reporting agencies. Murphy disputed the debt with the credit reporting agencies on the basis that the debt had been released by

the landlord. The credit reporting agencies notified NCS of the debt, and NCS investigated the debt and, based on all the information provided to NCS, verified that the debt was valid and accurate. Murphy disputed the debt again, so NCS investigated the debt again with the landlord, who then confirmed that the debt had been released under the lawsuit settlement agreement. NCS then promptly ceased reporting the debt to the credit reporting agencies two months after first reporting the debt. Murphy brought this suit against the NCS, claiming that NCS violated the Fair Credit Reporting Act and Federal Debt Collection Practices Act by seeking to collect the debt and reporting it to the credit reporting agencies when Murphy contended that he did not owe the debt because of the release. Murphy's dispute of the debt was based, not on any dispute of the debt's validity or accuracy, but on a legal defense to liability for the debt based on the release in unrelated litigation. So, in investigating and verifying the debt with the landlord, NCS, as a debt collector, was not in a position to determine the applicability of a release from an unrelated lawsuit on the debt. It was only required to verify that the landlord contended the debt was valid and that the amount was accurate. Therefore, as a matter of law, NCS is entitled to judgment on Murphy's claims for violations of the FRCA and FDCPA. Moreover, even if NCS violated the FCRA, such violation was negligent, at most. NCS only reported the debt to the credit reporting agencies for two months, and Plaintiff suffered no damage in the interim as a result. Therefore, he has no standing to assert a claim for violation of the FCRA.

## UNDISPUTED FACTS

### A. The Debt.

1.      Regional Billing Services, LLC ("RBS") is a billing limited liability company that works with The Connor Group, LLC, is an agent of The Connor Group, LLC, and has some common ownership with The Connor Group, LLC. App. at Exhibit "B," ¶ 2.

2.     The Connor Group is a property management company that manages the premises located 100300 City Walk Dr. in Woodbury, Minnesota, which is also known as the City Walk at Woodbury apartments and owned by City Walk TIC I, LLC ("City Walk"). *Id*. at ¶ 3.

3.     From August of 2019 until July of 2020, Kevin Murphy ("Murphy") was a resident at City Walk. *Id*. at ¶ 4. He signed a Lease with City Walk for a term beginning August 28, 2019, and ending on September 14, 2020. Exhibit "C." Murphy terminated the Lease early on July 26, 2020.

4.     The Lease included a Utilities Addendum wherein Murphy agreed to pay for water, wastewater/sewer, storm water, trash removal, gas, and "other common utilities." Exhibit "B-1." Moreover, the Utilities Addendum provided that "if Resident moves into or out of the Unit on a date other than the first of the month, Resident shall pay Utilities for the full period of the time that Resident was living in, occupying, or responsible for payment of rent for the Unit." *Id*.

5.     RBS was the billing service provider designated by The Connor Group and City Walk, pursuant to the Utilities and Services Addendum of Murphy's Lease at City Walk. Exhibit "B" at ¶ 5. Exhibit "B-1."

6.     Mr. Murphy's final utility bill was for $186.52, and RBS was the creditor for this alleged debt (the "Murphy Utility Debt"). Exhibit "A" at ¶ 6.

7.     On November 13, 2020, RBS sent the Murphy Utilities Debt in the amount of $186.52 to National Credit Systems, Inc. ("NCS") for collections. *Id*. at ¶ 7.

8.     Following the termination of his tenancy, RBS learned that that Murphy brought a lawsuit in the United States District Court for the District of Minnesota in which he alleged that The Connor Group and City Walk TIC I, LLC violated various civil rights statutes and failed to return his security deposit (the "Murphy Litigation"). *Id*. at ¶ 8. In the Murphy Litigation, Murphy

alleged that City Walk illegally charged him "pet rent" in violation of the Fair Housing Act ("FHA") and Minnesota Human Rights Act ("MHRA") ("the Lawsuit"). Doc. 18 at ¶ 16.

9.    RBS also learned that to fully and finally resolve the Murphy Litigation, and without any admission of liability, Murphy, The Connor Group and City Walk TIC I, LLC executed a Settlement Agreement releasing one another, and their respective agents, from any and all claims. *Id.* at ¶ 9; Exhibit "B-2."

10.    City Walk did not inform RBS of the settlement at the time the Settlement Agreement, dated April 28, 2021, was signed, nor did City Walk inform RBS that the Murphy Utility Debt was settled as part of the Settlement Agreement at that time. Exhibit "B" at ¶ 10.

11.    After receiving an email from NCS on or about August 17, 2021, concerning the Settlement Agreement. *Id.* at ¶ 11. At that time RBS inquired with City Walk whether the Murphy Utility Debt should be adjusted. City Walk indicated at that time that it desired to waive the Murphy Utility Debt because of the Settlement Agreement. *Id.* at ¶ 11. As a result, an entry was made on Murphy's Utility Account with RBS to "write off" the Murphy Utility Debt from $186.52 to "0.00" on August 20, 2021. *Id.*; Exhibit "B-2." RBS informed NCS of the adjustment to "$0.00" on August 21, 2021, via email. Exhibit "B" at ¶ 11.

12.    Previously, a representative of RBS, Erika Patterson, executed a Declaration prepared by the attorney representing Murphy in this case; however, it was not any intent of RBS to express any legal opinion when that declaration included the statement, "The settlement agreement released all claims and debts related to Mr. Murphy's tenancy, including the utility bill sent to NCS for collections." *Id.* at ¶ 12. Ms. Patterson was not an attorney and was not authorized to make any legal conclusions. *Id.*

**B.  NCS Policies to Obtain Verifiable Lease Debts for Collection**

13.     While also performing other collection related services, NCS is a third-party debt collector that collects debts from responsible parties that allegedly breached lease agreements. NCS has specialized in lease debt collection services for over thirty (30) years. Exhibit "A" at ¶ 4. Pursuant to the policies and procedures developed by NCS over that thirty-year time period, NCS requires the original creditor, or its property manager, that hires NCS to collect its outstanding receivables, to either provide to NCS or have available for NCS's review, a signed lease by the responsible parties, a lease application with the responsible parties' contact and personal information to help identify and verify the responsible parties, and provide a final account statement or other similar document, such as a tenant ledger, that provides a description of the charges due under the lease that comprises the alleged principal amount of the debt. *Id*. In addition, NCS's service agreements with its clients require the original creditor to represent that the debts provided to NCS for collection are accurate. *Id*. The service agreements also include an indemnity provision, whereby, if the original creditor provides a debt to NCS for collection that is not accurate, the original creditor must indemnify NCS from any damages resulting from the inaccuracy. *Id*. Such policies incentivize NCS's clients to avoid placing inaccurate or unverifiable debts. *Id*. Between the documents that support these leasing debts (leases and account statements prepared by property managers familiar with the lease terms) and NCS's service agreement terms, NCS can reasonably rely on the accuracy of the debts placed for collection. *Id*.

**C.  NCS' Investigation of Plaintiff's Disputes**

14.     It is NCS's policy to only provide accurate information to the CRAs. *Id*. at ¶ 5. Further, it is NCS's policy to conduct a reasonable investigation when a dispute is received, regardless of whether it is a direct dispute to NCS or indirect dispute received through ACDVs

from the CRAs. *Id*. NCS trains its investigators, and in the case of contractors hired as specialists for investigations such as Provana, such investigators receive separate training by Provana, to perform reasonable investigations, including the use of NCS's written policies and procedures which are described below. *Id*.

15.     Indirect Disputes Received through ACDVs. By way of background, for each dispute received by the CRAs from consumers, the CRA will review the consumer dispute received, determine the appropriate "dispute code" from a list of e-Oscar dispute codes, then submit the ACDV to NCS for response. *Id*. at ¶ 6. If the consumer attaches relevant documents or information to support their dispute to the CRAs, then the CRAs when submitting the ACDVs will (typically) include a description of the dispute and/or images from the consumer's dispute that would assist the data furnisher, like NCS, with its investigation or establish why the consumer was disputing the subject account. *Id*. For a situation like the one presented in this Litigation where the alleged debtor claims that the amount owed is not correct, pursuant to its written policies and procedures to conduct a reasonable investigation of these indirect disputes received through ACDVs, NCS's administrative personnel and contractors that conduct the investigations, will review the following: (1) the dispute code which is used to guide the investigation, (2) the account notes for the subject debt which will include notes on the investigation of any previous disputes, communications between NCS and the debtor, and communications between NCS and the original creditor, (3) the documents in NCS's batch file for the subject debt such as the lease, final account statement, and any tenant ledger, (4) any reasons for the dispute as supplied by the ACDV, and (5) any documents provided by the alleged debtor included with the ACDV, as well as previous documents supplied by the alleged debtor to NCS, all of which are kept in NCS's batch file for

the subject debt. Based on NCS's thirty years of experience investigating leasing debt disputes, this process for investigating leasing debts has proven to be reasonable. *Id.*

16. <u>Direct Disputes Received from the Alleged Debtor through ACDVs</u>. For a situation like the one presented in this Litigation where the alleged debtor claims that the amount owed is not correct, pursuant to its written policies and procedures to conduct a reasonable investigation of disputes made by the alleged debtor to NCS (referred to as "direct disputes" as opposed to the indirect disputes received from the CRAs through ACDVs), NCS uses its internal investigation team and reviews similar information and documents as the indirect dispute investigation process, namely, (1) the account notes for the subject debt which will include notes on the investigation of any previous disputes, communications between NCS and the debtor, and communications between NCS and the original creditor, (2) the documents in NCS's batch file for the subject debt such as the lease, final account statement, and any tenant ledger, (3) any reasons for the dispute as supplied by alleged debtor, and (4) any documents provided by the alleged debtor included with the dispute, as well as documents provided in any earlier disputes, all of which are kept in NCS's batch file for the subject debt. *Id.* at ¶ 7. In addition to those steps, and depending on the nature of the dispute, NCS will also communicate with the Original Creditor with a series of emails, and sometimes calls, to alert the Original Creditor of the dispute, the reason for the dispute, and to verify the amount claimed as due by the alleged debtor. *Id.* For leasing debts, particularly as NCS actively collects those debts through regular mailing campaigns and telephone contact campaigns, the original dispute on an account will typically and almost invariably occurs through a direct dispute, just as it did with facts involved in this Litigation. (When it does not occur in this sequence, it is usually because a credit repair organization is handling the disputes for a consumer, which is not involved in this Litigation.) *Id.* As such, most indirect disputes will have direct

7

dispute information and investigation results with which to use in the reasonable investigation of the indirect disputes. *Id*.

17.     <u>Issue of Legal Disputes</u>. Notably for this situation involved in this Litigation, NCS does not, and is not required under the framework of the FCRA, to train its collectors, investigators, or contractors to attempt to resolve legal disputes, interpret lease provisions, or research state law. *Id*. at ¶ 8. Specifically, in this instance with Plaintiff, NCS is not going to interpret any Settlement Agreement to determine the effect of its provisions. *Id*. Likewise, NCS is not going to make a legal determination whether a release of named parties to a release (here, the owner and property manager) include a third party, the Original Creditor, RBS, particularly if the settlement agreement and release do not name or reference the subject debt. Such a dispute is not one that NCS can resolve. *Id*.

18.     Conversely, if the matter is not one of contract interpretation, but a factual determination (e.g., if the Settlement Agreement named RBS as a party, was signed by RBS, or referenced the subject debt) that would not be considered a legal dispute, and one that would be resolved by a review of the Settlement Agreement. *Id*. at ¶ 9.

**D.  NCS's Investigation of Plaintiff's Disputes**

19.     All disputes received by NCS are noted and included on NCS's Account Demographics and Notes (the "Account Notes"). *Id*. at ¶ 10. All collectors, investigators, and contractors performing investigations are trained regarding NCS's collection software, WinDebt, including how to notate all activity taken with respect to a particular account and debt, including the investigations of any direct or indirect disputes. *Id*. The Account Notes for Plaintiff's debt allegedly owed to Resident Billing Services (f/k/a Regional Billing Services f/k/a Hearland Regional Power Co) ("RBS"), also referred to as the "Original Creditor," for utility charges while

Plaintiff was residing at 10300 City Walk Dr. in Woodbury, Minnesota, which is also known as the City Walk at Woodbury apartments owned by City Walk TIC I, LLC and managed by The Connor Group, LLC (collectively "City Walk Apts") are attached here to as Exhibit "A-1" and detailed below. *Id*.

20.    <u>Plaintiff's Oral Direct Dispute on November 23, 2020</u>. This first dispute made by Plaintiff was made directly to NCS during a telephone conversation between Plaintiff and NCS on November, 2020. Exhibit "A" at ¶ 11; Exhibit "A-1" at p. 1. As a result of that direct dispute, the collector correctly marked the account as disputed by the Plaintiff which then updates any data furnished to the CRAs to include that dispute (a code "XB" on the e-Oscar system). Exhibit "A" at ¶ 11. The collector also reviewed NCS's batch file (documents received from the Original Creditor, which consisted only of the Account Statement attached as Exhibit "A-2") and set in motion (1) contact by email to the Original Creditor seeking additional documents to support and verify the debt to the Original Creditor (notations made at 3:46pm on November 23, 2020) for which the Original Creditor responded that no other documents were available, and notably, did not indicate that the debt was no longer owed; and (2) sending Plaintiff a debt verification letter with a copy of the Account Statement (NCS's Form "11" letter notated on December 1, 2020 at 5:16pm). Exhibit "A" at ¶ 11; Exhibit "A-1" at p. 2.

21.    <u>Plaintiff's Indirect Dispute processed on June 25, 2021</u>. After sending Plaintiff a copy of the Account Statement on December 1, 2020, there was no additional contact with Plaintiff nor any activity until NCS processed two ACDVs on or about June 25, 2021, related to the same dispute letter from Plaintiff, one copy to Trans Union, one copy to Equifax, dated May 18, 2021. Exhibit "A" at ¶ 12. Notably, the letters referenced Plaintiff's lawsuit and settlement with CityWalk, claimed it released the subject debt, and included a sanitation invoice (for which appears

to have no connection to Plaintiff's debt either temporally or substantively) and a copy of the City Walk Settlement Agreement. Exhibit "A" at ¶ 12; Exhibits "A-3" and "A-4." As provided in the Account Notes, the investigator from Provana reviewed, inter alia, (1) "information submitted by the consumer who is disputing and claims settlement…", (2) "account information… and checked for accuracy…", and (3) "system notes for past activity." Exhibit "A" at ¶ 12; Exhibit "A-1" at p. 3. By those Notes, we know the investigator reviewed the attached Settlement Agreement that does not mention RBS or the subject debt, the Account Statement supporting the Debt, and the previous entries verifying the Debt. Exhibit "A" at ¶ 12. As a result of that reasonable investigation, the investigator responded with e-Oscar dispute response code "23" which verifies the debt while updating other account information as no documentation in the review indicated that the subject Debt was settled by RBS. Exhibit "A" at ¶ 12; Exhibit "A-1" at p. 3.

22.    <u>Plaintiff's Direct and Indirect Dispute dated July 22, 2021 and processed August 17, 2021</u>. Less than two months after the initial indirect dispute, Plaintiff sent a second written dispute letter to TransUnion and Equifax, but this time also copying NCS. Exhibit "A" at ¶ 13. As a result of this combination direct/indirect dispute, the direct dispute was processed first on August 17, 2021. Exhibit "A" at ¶ 13; Exhibit "A-1" at p. 3. The receipt of the letter triggered another inquiry to the Original Creditor, RBS, at "customerservice@residentbillpay" to inquire about the Settlement Agreement, as well as a follow-up email on August 21, 2021. Exhibit "A" at ¶ 13; Exhibit "A-1" at pp. 3–4.  In response, RBS responded on August 21, 2021, that the account balance was adjusted to "0.00." Exhibit "A" at ¶ 13; Exhibit "A-1" at p. 4. As a result, NCS closed the account as recalled by RBS and sent Plaintiff a cancellation letter on the same day, August 21, 2021. Exhibit "A" at ¶ 13; Exhibit "A-1" at p. 4. The closing of the account would have also

triggered ACDVs responses that the account was deleted, which removes the account from any credit reporting that occurred after August 21, 2021. Exhibit "A" at ¶ 13.

23.     This reasonable investigation process resulted in deletion of the account and in relatively short order. Exhibit "A" at ¶ 14. Despite the deletion, Plaintiff filed suit against NCS two months later on October 20, 2021. *Id.*

24.     Settlement Agreement did not release Plaintiff's RBS Utility Debt according to RBS's documents. What NCS has learned in this Litigation is that the Settlement Agreement did not trigger any waiver or release of the debt to RBS at or near the time of the settlement. The Settlement Agreement was signed on April 28, 2021. Exhibit "A" at ¶ 15; Exhibits "A-3" through "A-6." However, the RBS Account for Plaintiff's utility charges was not "written off" by RBS until August 20, 2021 according to Account Statement provided by RBS in this Litigation. Exhibit "A" at ¶ 15; Exhibit "B-2." By that RBS Account Statement, Plaintiff's Debt was not waived until after NCS notified RBS of Plaintiff's dispute that included a copy of the Settlement Agreement. Exhibit "A" at ¶ 15; Exhibit "B-2."

## STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Withers v. Dick's Sporting Goods, Inc.*, 636 F.3d 958, 962 (8th Cir. 2011). On summary judgment, once the moving party makes its initial showing, "the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2011).

## ARGUMENT AND AUTHORITIES

**I.    The summary judgment evidence conclusively proves that the information NCS reported to the credit reporting agencies was valid and accurate and, therefore, as a matter of law did not violate the FCRA or FDCPA.**

As demonstrated by the summary judgment evidence supporting the Undisputed Facts, the debt NCS reported to the CRAs is conclusively proved to be valid. Murphy does not dispute that he signed the Lease with City Walk for a term expiring on September 14, 2020, and that the Lease included a Utilities Addendum. Murphy also does not dispute that he terminated the Lease early on July 26, 2020, and still owed charges to City Walk for common electricity and gas, sewer, water, stormwater, trash removal, administrative fee, and termination fee for a total of $186.52. Therefore, the summary judgment evidence conclusively proves that the debt ProCollect attempted to collect and that it reported to the CRAs was valid and accurate.

The only issue was whether the debt was generally released by a Settlement Agreement signed by Murphy and City Walk regarding a Lawsuit unrelated to the debt. Murphy does not dispute that he otherwise owed the debt.

**II.   The summary judgment evidence conclusively proves that there was no factual inaccuracy in the reported debt and that NCS performed a reasonable investigation of the debt because Murphy's dispute of the debt was based solely on the release, which did not challenge the validity of the debt; therefore, NCS did not violate the FCRA or FDCPA as a matter of law.**

**A.  Fair Credit Reporting Act.**

**1.  Plaintiff's Allegations**

Murphy alleges that NCS violated the FCRA as follows:

38.    Upon information and belief, Defendant NCSI failed to conduct a reasonable investigation, or otherwise discharge its duties under 15 U.S.C. 1681s-2(b) and continued to furnish inaccurate information regarding Plaintiff.

39.   Upon information and belief, NCSI continued to furnish the same inaccurate information regarding Plaintiff through its regular Metro 2 reporting schedule.

\*      \*      \*

46.   The foregoing acts and omissions of Defendants constitute violations of the FCRA, including, but not limited to, 15 U.S.C. §§1681e(b), 1681i and 1681s-2.

\*      \*      \*

48.   The foregoing acts and omissions of Defendants constitute knowing and willful violations of the FCRA, including, but not limited to, 15 U.S.C. §§1681e(b), 1681i and 1681s-2.

Doc. 18.

The summary judgment evidence conclusively proves there were no factual inaccuracies regarding Murphy's debt that NCS could have found through a reasonable investigation, so NCS's reporting of the debt to the CRAs did not violate the FCRA.

## 2.   Applicable Law

Congress enacted the FCRA "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Hunt v. JPMorgan Chase Bank, Nat'l Ass'n*, 770 F. App'x 452, 453 (11th Cir. 2019) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007)). The FCRA governs the conduct of CRAs, as well as furnishers, the entities that supply information to CRAs. *Id*. In this case, NCS is a furnisher. The FCRA prohibits furnishers from "furnish[ing] any information relating to a consumer to any [CRA] if the person knows or has reasonable cause to believe that the information is inaccurate" or "if the person has been notified by the consumer . . . that specific information is inaccurate [and] the information is, in fact, inaccurate." 15 U.S.C. § 1681s-2(a)(1).

Upon notice that a consumer disputed the accuracy or completeness of information provided by a furnisher, the furnisher must conduct an investigation regarding the disputed

information, review all relevant information provided by the CRA, and report the results of the investigation to the CRA. *Id.* § 1681s-2(b)(1). If the investigation reveals that the disputed information is incomplete, inaccurate, or cannot be verified after reinvestigation, the furnisher must either modify, delete, or permanently block reporting of that information. *Id.* For information determined to be inaccurate or incomplete, the furnisher must also report those results to all CRAs. *Id.*

Absent a showing of actual inaccuracy on a reinvestigation, a plaintiff's claim against a furnisher of information to a CRA fails as a matter of law. *See Chiang v. Verizon New Eng., Inc.,* 595 F.3d 26, 37 (1st Cir. 2010). There must be some causal relationship between the CRA's allegedly unreasonable reinvestigation and the failure to discover inaccuracies in his account. *Id.* Plaintiffs suing furnishers under § 1681s-2(b) must make the same showing, for several reasons. *Id.* Just as in suits against CRAs, a plaintiff's required showing is factual inaccuracy, rather than the existence of disputed legal questions. *Id.* at 38. Like CRAs, furnishers are "neither qualified nor obligated to resolve" matters that "turn[] on questions that can only be resolved by a court of law." *Id.*

"Generally, unresolved contract disputes constitute legal disputes are not factual inaccuracies." *Belair v. Holiday Inn Club Vacations Inc.,* No. 6:21-cv-165-WWB-DCI, 2022 U.S. Dist. LEXIS 235853, at *7–8 (M.D. Fla. 2022); *Holden v. Holiday Inn Club Vacations Inc.,* No. 6:19-cv-2373-CEM-EJK, 2022 U.S. Dist. LEXIS 62830, at *7 (M.D. Fla. 2022) (citing *Batterman v. BR Carroll Glenridge, LLC,* 829 F. App'x 478, 481–82 (11th Cir. 2020)); *see also Wilson v. SunTrust Bank, Inc.,* 533 F. Supp. 3d 1363, 1369 (S.D. Ga. 2021) (finding that the question of whether the plaintiff was contractually obligated to make loan payments was one of legal interpretation and not factual accuracy); *Baldeosingh v. TransUnion, LLC,* No. 8:20-cv-925-WFJ-

JSS, 2021 U.S. Dist. LEXIS 61726, 2021 WL 1215001, at *3 (M.D. Fla. March 31, 2021) ("A consumer fails to establish a factual inaccuracy . . . by merely asserting a challenge to the legal validity of a reported debt.").

The Eleventh Circuit has stated, in an unpublished opinion, that "[a] plaintiff must show a factual inaccuracy rather than the existence of disputed legal questions to bring suit against a furnisher under § 1681s-2(b)." *Hunt*, 770 F. App'x at 458 (citation omitted). Numerous courts have found that a furnisher's duty under the FCRA to investigate does not apply to legal disputes. *See, e.g., Holden*, 2022 U.S. Dist. LEXIS 62830, at *7 n.3 ("The Court finds *Hunt* far more persuasive than out-of-circuit case law."); *Jackson v. Bank of Am., N.A.*, No. 2:19-cv-01940-RDP, 2022 U.S. Dist. LEXIS 85075, 2022 WL 1493849, at *4 (N.D. Ala. May 11, 2022); *Kahalani v. Experian Info. Sols., Inc.*, No. 20-81018-CV, 2020 U.S. Dist. LEXIS 263897, 2020 WL 13388260, at *2–3 (S.D. Fla. Dec. 29, 2020); *Santessi v. Experian Info. Sols., Inc.*, No. 20-22689-CIV, 2020 U.S. Dist. LEXIS 198832, 2020 WL 13401919, at *2–3 (S.D. Fla. Oct. 26, 2020); *see also Wilson*, 533 F. Supp. 3d at 1369 ("[F]furnishers are neither qualified nor obligated to resolve issues that can only be resolved by a court of law."); *Bauer v. Target Corp.*, No. 8:12-cv-00978-AEP, 2013 U.S. Dist. LEXIS 201316, 2013 WL 12155951, at *13 (M.D. Fla. June 19, 2013) ("[A] furnisher's duty to investigate extends to factual inaccuracies, not legal disputes.").

*Chiang* is the leading case on the issue of whether an alleged legal dispute regarding the validity or enforceability of an underlying debt renders that debt "inaccurate" for purposes of a section 1681s-2(b) claim against a furnisher, which the Eleventh Circuit subsequently followed in *Hunt*.[1] In addition, numerous courts have applied *Chiang* when addressing this issue. *See Holland*

_____

[1] While *Chiang* has not been endorsed universally, *see, e.g., Denan v. Trans Union LLC*, 959 F.3d 290, 295 (7th Cir. 2020) (noting that because furnishers, unlike CRAs, "assume[] the risk and bear the loss of unpaid debt . . .

*v. Chase Bank United States, N.A.*, 475 F. Supp. 3d 272, 276 (S.D.N.Y. 2020) ("[h]ere, [plaintiff's]

claim of 'factual inaccuracy' relies entirely on his legal contention that his debts had been

discharged due to the purported running of the relevant state's statute of limitations[;] . . . [s]uch a

dispute is a legal, not a factual, challenge, and . . . plainly insufficient to support [plaintiff's] FCRA

claim [under section 1681s-2(b)]"), and elsewhere, *see, e.g., Garey v. BWW Law Grp., LLC*, 2021

U.S. Dist. LEXIS 190885, 2021 WL 4521329, *16–17 (D. Md. 2021) ("[t]he fact that [plaintiff]

continues to dispute the legality of the [reported] foreclosure is of no object—[furnisher defendant]

is neither qualified nor obligated to resolve a question that can only be resolved by a court of law")

(citation and quotations omitted); *Garland v. Marine Credit Union*, 2018 U.S. Dist. LEXIS

183619, 2018 WL 5313769, *2, 4 (E.D. Wis. 2018) ("the dispute in this case is not over a factual

inaccuracy in [d]efendants' reporting but rather a legal dispute regarding the impact the [state court

amortization] proceeding had on [plaintiff's] debt overall[;] . . . [a]s a result, unless and until a

proper tribunal concludes the [state court amortization] proceeding eliminated the debts in their

entirety or that the plan precludes the accrual of post-filing interest and other penalties, [p]laintiff

cannot establish that the reported information is factually inaccurate"); *Mehta v. Wells Fargo Bank,

N.A.*, 2017 U.S. Dist. LEXIS 223523, 2017 WL 10573815, *3 (C.D. Cal. 2017) ("[plaintiff's]

assertion—that [d]efendant's failure to perform all of its contractual obligations absolved

[p]laintiff of her own duty to pay—is simply a contractual defense to the underlying debt [and]

[t]he FCRA does not require [d]efendant [furnisher] to adjudicate [p]laintiff's legal contentions in

---

they are in a better position to determine the legal validity of a debt"); *Thompson v. Transunion Data Sols., LLC*, 2021 U.S. Dist. LEXIS 91064, 2021 WL 1923409, *2 (N.D. Ill. 2021) ("[u]nlike [CRAs], furnishers must resolve legal questions regarding the liability when necessary to resolve disputed information"), it certainly appears to represent the prevailing view when courts deal with the type of claim asserted against furnishers like plaintiffs' here. *Mohnkern*, 2021 U.S. Dist. LEXIS 218532, at *15.

the course of a credit investigation") (footnote omitted).

The Eighth Circuit has not ruled on whether furnishers have an obligation to resolve legal questions regarding a debt's validity during the investigation process, but in *Johnson v. Sheffield*, the Easter District of Arkansas Court held that an investigation by a furnisher pursuant to the FCRA of a legal dispute of a debt could not and should not change anything. No. 4:19-cv-616-LPR, 2020 U.S. Dist. LEXIS 113468, at *9 (E.D. Ark. 2020). The data furnisher argued that furnishers do not have such an obligation, citing a First Circuit case holding the following:

> a plaintiff's required showing [in § 1681s-2(b) cases] is factual inaccuracy, rather than the existence of disputed legal questions. . . . [F]urnishers are neither qualified nor obligated to resolve matters that turn[] on questions that can only be resolved by a court of law. *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 38 (1st Cir. 2010) (quotations omitted); *see also Hunt v. JPMorgan Chase Bank, Nat'l Ass'n*, 770 F. App'x 452, 458 (11th Cir. 2019) (unpublished) ("A plaintiff must show a factual inaccuracy rather than the existence of disputed legal questions to bring suit against a furnisher under § 1681s-2(b).").

*Id*. The District Court agreed with the data furnisher and the First Circuit on this point. *Id*.

### 3. ProCollect conducted a reasonable investigation of the debt, and there was no factual inaccuracy.

Murphy does not dispute that he failed to pay the charges, and NCS verified that information with Landlord. So there was no factual inaccuracy about the debt for NCS's investigation to discover. Murphy's dispute did not challenge or suggest any factual inaccuracy in the debte. He claims that the debt was released in the murphy Litigation. But this a legal defense to the debt, not a factual inaccuracy in NCS's reporting. *See Leones v. Rushmore Loan Mgmt. Servs., LLC*, 2017 U.S. Dist. LEXIS 204157, 2017 WL 6343622, at *3 (S.D. Fla. Dec. 11, 2017) ("Plaintiff has alleged at best a legal defense to the debt, not a factual inaccuracy in [the furnisher's] reporting."); *Wilson v. Suntrust Bank, Inc*., 533 F. Supp. 3d 1363, 1370 (S.D. Ga. 2021) ("[B]ecause Plaintiff's contention that Defendant furnished inaccurate information is based on a

legal contention, . . . Defendant's Motion for Summary Judgment may be granted on this ground alone.").

Murphy's dispute of the debt required ProCollect to interpret the general release language in the settlement agreement and determine—not the validity of the debt—but the validity of Murphys' legal defense to the debt.[2] Release is an affirmative defense. *See Arends v. Hous. Lighting & Power Co*., 969 F. Supp. 424, 428 (S.D. Tex. 1997). Determining the validity of a release requires application of the rules of contract construction. *See Arnold v. Cargill Inc*., Civil No. 01-2086 (DWF/AJB), 2002 U.S. Dist. LEXIS 13045, at *19 (D. Minn. 2002) (citing *Lancaster v. Buerkle Buick Honda Co*., 809 F.2d 539, 541 (8th Cir.), *cert. denied*, 482 U.S. 928, 107 S. Ct. 3212, 96 L. Ed. 2d 699 (1987). That analysis involves consideration of the following factors: (1) the clarity of the language; (2) whether the release was supported by adequate consideration; (3) whether the release purports to settle claims unknown at the time of execution; (4) whether the challenging party was permitted to change language in the release; and (5) whether counsel was present during negotiation of the release. *Id*; see also *Arends*, 969 F. Supp. at 428 (citing *Kucel v. Walter E. Heller & Co*., 813 F.2d 67, 70 (5th Cir. 1987) ("Texas law holds that a valid release must be supported by consideration and must indicate that the releasor has received 'a satisfaction' of any obligations referred to in the release.").

Moreover, release is a defense in the nature of confession and avoidance. *Id*. An affirmative

---

[2] *See Batterman v. BR Carroll Glenridge, LLC*, No. 1:19-CV-1598-CC-RDC, 2020 U.S. Dist. LEXIS 63117, at *20–21 (N.D. Ga. 2020) ("Of course, the FCRA does not require a plaintiff to prove an inaccuracy in a consumer report before a CRA is obligated to conduct a reasonable investigation, but a plaintiff does have to present a purported factual inaccuracy, rather than a legal defense or legal dispute. Likewise, in this legal proceeding, the Court's finding is not that Plaintiff has pleaded insufficient facts to allege a plausible factual inaccuracy. Rather, the facts that Plaintiff has pled show that Plaintiff's FCRA claims are based on a legal, contractual dispute. Plaintiff thus has no viable FCRA claims against Equifax or Trans Union.").

defense has "the structure of 'confession and avoidance,' that is to say, [it] admit[s] the initial sufficiency and completeness of the claim while asserting other grounds for avoiding the normal consequences of that concession." *Satis Vacuum Indus. Vertriebs, A.G. v. Optovision Techs., Inc.*, Civil Action No. 3:99-CV-2147-M, 2001 U.S. Dist. LEXIS 15043, at *41 (N.D. Tex. 2001) (quoting *Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1125-26 (5th Cir. 1988)); *see also In re Knight*, 208 F.3d 514, 517 (5th Cir. 2000) ("an 'avoidance or affirmative defense' . . . 'assumes the plaintiff proves everything he alleges and asserts, even so, the defendant wins.'"). Murphy's dispute of the debt based on release necessarily admitted or assumed the validity and accuracy of the debt but sought to avoid it on other grounds. Therefore, as a matter of law, NCS did not report, or fail to discovery through a reasonable investigation, any factual inaccuracy regarding the debt.

Plaintiff's first dispute of the debt was made directly to NCS during a telephone conversation between Plaintiff and NCS on November, 2020. Exhibit "A" at ¶ 11; Exhibit "A-1" at p. 1. As a result, the collector correctly marked the account as disputed by the Plaintiff which then updates any data furnished to the CRAs to include that dispute (a code "XB" on the e-Oscar system). Exhibit "A" at ¶ 11. The collector also reviewed NCS's batch file (documents received from the Original Creditor, which consisted only of the Account Statement attached as Exhibit "A-2") and contacted the Original Creditor by email seeking, additional documents to support and verify the debt to the Original Creditor, and the Original Creditor responded that no other documents were available. Importantly, the Original Creditor did not indicate that the debt was no longer owed or had otherwise been released. ProCollect then sent Plaintiff a debt verification letter with a copy of the Account Statement (NCS's Form "11" letter noted on December 1, 2020 at 5:16pm). Exhibit "A" at ¶ 11; Exhibit "A-1" at p. 2.

There was no additional contact with Plaintiff nor any activity until NCS processed two ACDVs on or about June 25, 2021, related to the same dispute letter from Plaintiff, one copy to Trans Union, one copy to Equifax, dated May 18, 2021. Exhibit "A" at ¶ 12. The letters referenced Plaintiff's lawsuit and settlement with CityWalk, claimed it released the subject debt, and included a sanitation invoice (for which appears to have no connection to Plaintiff's debt either temporally or substantively) and a copy of the City Walk Settlement Agreement. Exhibit "A" at ¶ 12; Exhibits "A-3" and "A-4." The investigator reviewed the attached Settlement Agreement that does not mention RBS or the subject debt, the Account Statement supporting the Debt, and the previous entries verifying the Debt. Exhibit "A" at ¶ 12. As a result of that reasonable investigation, the investigator responded with e-Oscar dispute response code "23," which verifies the debt while updating other account information as no documentation in the review indicated that the subject Debt was settled by RBS. Exhibit "A" at ¶ 12; Exhibit "A-1" at p. 3.

Less than two months after the initial indirect dispute, Plaintiff sent a second written dispute letter to TransUnion and Equifax, but this time also copying NCS on July 22, 2021. Exhibit "A" at ¶ 13. The receipt of the letter triggered another inquiry to the Original Creditor, RBS, at "customerservice@residentbillpay" to inquire about the Settlement Agreement, as well as a follow-up email on August 21, 2021. Exhibit "A" at ¶ 13; Exhibit "A-1" at pp. 3–4.  In response, RBS responded on August 21, 2021, that the account balance was adjusted to "0.00." Exhibit "A" at ¶ 13; Exhibit "A-1" at p. 4. As a result, NCS closed the account as recalled by RBS and sent Plaintiff a cancellation letter on the same day, August 21, 2021. Exhibit "A" at ¶ 13; Exhibit "A-1" at p. 4. The closing of the account would have also triggered ACDVs responses that the account was deleted, which removes the account from any credit reporting that occurred after August 21, 2021. Exhibit "A" at ¶ 13.

This reasonable investigation process resulted in deletion of the account and in relatively short order. Exhibit "A" at ¶ 14. The Settlement Agreement did not release Plaintiff's RBS Utility Debt according to RBS's documents. What NCS has learned in this Litigation is that the Settlement Agreement did not trigger any waiver or release of the debt to RBS at or near the time of the settlement. The Settlement Agreement was signed on April 28, 2021. Exhibit "A" at ¶ 15; Exhibits "A-3" through "A-6." However, the RBS Account for Plaintiff's utility charges was not "written off" by RBS until August 20, 2021, according to the Account Statement provided by RBS in this Litigation. Exhibit "A" at ¶ 15; Exhibit "B-2." By that RBS Account Statement, Plaintiff's debt was not waived until after NCS notified RBS of Plaintiff's dispute that included a copy of the Settlement Agreement. Exhibit "A" at ¶ 15; Exhibit "B-2."

Plaintiff's first, oral, dispute of the debt to NCS did not indicate that there was a written release, and when NCS contacted the Original Creditor about the debt, the Original Creditor did not mention any such release, either. Instead, the Original Creditor verified the validity and accuracy of the debt. When Plaintiff then indirectly disputed the debt to the CRAs and included the Settlement Agreement, ProCollect responded to the ACDV from the CRAs by reinvestigating the debt. ProCollect reviewed all documents from Plaintiff and the Original Creditor, but the Settlement Agreement neither mentioned RBS nor the debt and otherwise required ProCollect to interpret the legal effect a legal document between Plaintiff and Original Creditor containing a general release arising from an unrelated lawsuit. Plaintiff did not otherwise challenge the validity or accuracy of the debt. He only sought to avoid liability for the valid debt by virtue of the release. When Plaintiff disputed the debt again with the CRAs and copied NCS on his dispute, NCS investigated a third time. Only then did the Original Creditor inform ProCollect that the debt and been waived and reduced to zero based on the release. ProCollect then immediately deleted the

debt in its reporting to the CRAs. There was never a factual inaccuracy in the debt—only Plaintiff's avoidance of the valid debt by virtue of a general release from an unrelated lawsuit. ProCollect conducted a reasonable investigation in response to each dispute and immediately deleted the debt from its reporting when the Original Creditor informed ProCollect that the release waived the debt.

Thus, because Murphy's inaccuracy claim is inherently "tethered to a legal dispute" with City Walk, it cannot form the basis of a violation under section 1681s-2(b). *See, e.g., Schuh v. American Express Bank, FSB*, 2018 U.S. Dist. LEXIS 75887, 2018 WL 3730897, *4 (S.D. Fla.), *report and recommendation adopted by*, 2018 U.S. Dist. LEXIS 75888, 2018 WL 3730226 (S.D. Fla. 2018), *aff'd*, 806 F. App'x 973 (11th Cir. 2020). Murphy's claim is based on a legal dispute that is not actionable under the FCRA and NCS is entitled to summary judgment. *Belair v. Holiday Inn Club Vacations Inc*., 2022 U.S. Dist. LEXIS 235853, at *11; *See Hunt* at 458; *see also Mayer*, No. 6:20-cv-2283; *Holden* at *3–4.

**B.  Plaintiff lacks standing to assert an FCRA claim.**

The FCRA provides for civil liability in 15 U.S.C. §§ 1681n and 1681o. Whether the violation was willful or negligent dictates the type of damages awarded. *Cameron v. Greater New Orleans Fed. Credit Union*, 713 F. App'x 238, 240 (5th Cir. 2018). If a violation is willful, the defendant is subject to punitive damages. 15 U.S.C. § 1681n. However, if a plaintiff fails to show that the violations are willful, a defendant will only be held liable for the plaintiff's actual damages. *See* 15 U.S.C. § 1681o; *Cameron*, 713 F. App'x at 240. If a plaintiff fails to demonstrate willfulness and actual damages, the claim must fail. *Cameron* at 240. According to section 1681n, a defendant commits a willful violation and is subject to punitive damages only if it engages in "willful misrepresentations or concealments." 15 U.S.C. § 1681n(a)(2); *see also Stevenson v. TRW, Inc*., 987 F.2d 288, 294 (5th Cir. 1993) (quoting *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir.

1986)). Noncompliance is considered willful when the defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others." *Pinner*, 805 F.2d at 1263. A failure to adequately investigate and swiftly correct inaccurate information generally does not constitute a willful violation. *See id.* at 1262–63.

The summary judgment evidence conclusively proves that NCS did not "knowingly and intentionally" commit an act in conscious disregard to Murphy's rights. Moreover, the summary judgment evidence conclusively proves that no negligent violation was committed either.

Even if NCS violated the FCRA negligently, Murphy can only recover actual damages—if he has any. *See* 15 U.S.C. § 1681o; *Cameron* at 240. But the summary judgment evidence proves that NCS only reported the debt to the CRAs for two months. In his deposition, Murphy could not provide any credible evidence of mental anguish damages. He testified that the reporting of a $186 debt to the CRAs for two months caused him stress, difficulty focusing at work, overdrinking, and trouble sleeping. Exhibit "D" at 62:19–63:5, 64:15–25. But he did not seek help from a therapist or other provider. *Id.* at 73:21–74:8. "[M]ental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish . . . ." *Vazzano v. Receivable Mgmt. Servs., LLC*, Civil Action No. 3:21-CV-0825-D, 2022 U.S. Dist. LEXIS 144258, at *24 (N.D. Tex. 2022) (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)). "[A]n FCRA plaintiff seeking emotional distress damages is required to present 'evidence of genuine injury, such as the evidence of the injured party's conduct and the observations of others,' and to demonstrate 'a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award.'" *Paul v. Trans Union, LLC*, No. 4:20-CV-00794-SDJ-CAN, 2021 U.S. Dist.

23

LEXIS 149645, at *31 (E.D. Tex. 2021) (quoting *Wagner v. BellSouth Telecomms., Inc.*, 520 F. App'x 295, 298 (5th Cir. 2013)).

Injury in fact is a constitutional requirement, and "[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S. Ct. 1540, 1547–48 (2016). To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 1548 (quoting *Lujan*, 504 U. S., at 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351). A "concrete" injury must be "de facto"; that is, it must actually exist. *Id.* (citing Black's Law Dictionary 506 (10th ed. 2014)). "When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'" *Id.* (citing Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967)). Article III standing requires a concrete injury even in the context of a statutory violation. *Id.* at 1549.

As the summary judgment evidence proves that Murphy did not sustain any concrete injury, he has no standing to assert his claim under the FCRA.

### C.  Fair Debt Collection Practices Act

Murphy alleges that NCS violated the FDCPA as follows:

38.   Upon information and belief, Defendant NCSI failed to conduct a reasonable investigation, or otherwise discharge its duties under 15 U.S.C. 1681s-2(b) and continued to furnish inaccurate information regarding Plaintiff.

39.   Upon information and belief, NCSI continued to furnish the same inaccurate information regarding Plaintiff through its regular Metro 2 reporting schedule.

*       *       *

40. By furnishing inaccurate information to Equifax and TransUnion, Defendant National Credit Systems communicated credit information it knew, or had reason to know, was false in violation of 15 U.S.C. §1692e(8).

41. By furnishing inaccurate information to Equifax and TransUnion, Defendant National Credit Systems made a false representation of the character, amount, or legal status of a debt in violation of 15 U.S.C. §1692e(2)(A).

42. By furnishing inaccurate information to Equifax and TransUnion, Defendant National Credit Systems made a false representation in the collection of a debt in violation of 15 U.S.C. §1692e(10).

43. By furnishing inaccurate information to Equifax and TransUnion, Defendant National Credit Systems attempted to collect a debt not authorized by law or contract in violation of 15 U.S.C. §1692f(1).

\* \* \*

50. The foregoing acts and omissions of Defendant constitute violations of the FDCPA, including, but not limited to 15 U.S.C. §§ 1692e(2)(A), 1692e(8), 1692e(10), 1692f(1).

Doc. 18.

Plaintiff's' FDCPA claim relates to NCS's efforts to collect the debt and, as with their FCRA claim, similarly hinges on their contention that she does not owe the debt to The Falls under Missouri law (for the reasons detailed above). NCS is entitled to judgment as a matter of law.

To sustain a claim under the FDCPA, a plaintiff must show that "(1) she has been the object of collection activity arising from consumer debt, (2) the defendant is a debt collector as defined by the FDCPA, and (3) the defendant has engaged in an act or omission prohibited by the FDCPA." *Ossipova v. Pioneer Credit Recovery, Inc.*, 2019 U.S. Dist. LEXIS 214455, 2019 WL 6792318, \*3 (S.D.N.Y. 2019) (citation omitted). Here, only the third element is in dispute; Murphy alleges that NCS's attempt to collect the debt violated sections 1692e, 1692e(2)(A), 1692e(5), 1692e(8), 1692e(10), and 1692f(1) of the FDCPA. Doc. 1-2 at 10–11.

Section 1692e of the FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. §

1692e. Among other things, this section prohibits the "false representation of the character, amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A), the "threat to take any action that cannot legally be taken or that is not intended to be taken," 15 U.S.C. § 1692e(5), and the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer," 15 U.S.C. § 1692e(10). Moreover, the FDCPA precludes debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt," 15 U.S.C. § 1692f, which includes the "collection of any amount . . . unless such amount is expressly authorized by the agreement creating the debt or permitted by law," *id.* at § 1692f(1). Whether a communication violates the FDCPA is evaluated under the "least sophisticated consumer" standard, which is an "objective standard, designed to protect all consumers, the gullible as well as the shrewd." *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 51 (2d Cir. 2018) (citation and quotations omitted), *cert. denied*, 139 S. Ct. 1282, 203 L. Ed. 2d 280 (2019).

As with Murphy's FCRA claim, Murphy's dispute of the debt was unrelated to any factual inaccuracy regarding the debt. His dispute was based solely on his legal defense against the debt, a subsequent, unrelated Lawsuit yielding a settlement agreement with general release language purporting to cover City Walk's enforcement of the valid debt.

These claims fail because the summary judgment evidence conclusively proves that NCS did not use any misrepresentations or deceptive means to collect the debt. "[T]he FDCPA is concerned with unlawful debt collection practices, not mere disputes over the legality of the underlying debts." *Chambers*, 68 F. App'x at 715 (no FDCPA claim where plaintiff's complaint "ma[de] clear that the real issue is whether she [was] liable [for the debt at issue], not whether the defendants engaged in unlawful collection practices"), *cert. denied*, 540 U.S. 1119, 124 S. Ct. 1064, 157 L. Ed. 2d 913 (2004). Even if the Court considered an argument that Murphy presented

a legal question as to the construction and interpretation of the Lease to determine whether she is liable under the Lease, there would not be a violation of the FDCPA. *See e.g., Ducrest v. Alco Collections, Inc*., 931 F. Supp. 459, 462 (M.D. La 1996) (The FDCPA "does not require an independent investigation of the information provided by clients when a debt collector tries to collect a debt, nor does it require the debt collector to dispute the creditor's construction of a contract.").

## PRAYER

WHEREFORE, Defendant National Credit Systems, Inc. respectfully request that the Court grant it summary judgment as a matter of law on all of Murphy's claims against it, that Murphy's claims be dismissed with prejudice and with costs taxed against Murphy, and for such other relief to which NCS may be justly entitled.

Dated: April 21, 2023

Respectfully submitted,

*s/John W. Bowdich*

JOHN W. BOWDICH
State Bar No. 00796233
BOWDICH & ASSOCIATES, PLLC
8150 N. Central Expy., Suite 500
Dallas, Texas 75206
(214) 307-9500 – Telephone
(214) 307-5137 – Telecopy
jbowdich@bowdichlaw.com
*Admitted Pro Hac Vice*

ATTORNEYS FOR DEFENDANT
NATIONAL CREDIT SYSTEMS, INC.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 7.1(f) in the District of Minnesota. This Memorandum contains 8,699 words using word count in Microsoft Word Version 2303, Build 16227.20280, in Microsoft Office 365.

s/John W. Bowdich
John W. Bowdich